Good morning. I'm Karen Landau and I represent Daikun Cho. This morning I'm going to address the, I'm afraid I may be echoing my predecessor there, in addressing the 404B, 403 argument and also the sentencing guideline issue regarding vulnerable victim. In this case, the district court abused its discretion by admitting two types of unduly prejudicial evidence. They neither qualified under 404B and they certainly violated, they certainly were unfairly prejudicial. Their probative value was substantially outweighed by the prejudice under 403. The court, so the, I'll just, we'll go to the, first we had an uncharged shooting. So, you know, I will address the 20HA letter in this context that the government submitted a 20HA letter last week. The government argued, well, offenses to be admissible, uncharged conduct doesn't have to be identical. It doesn't, you know, the similarity, you know, it doesn't have to be exactly similar. And in my brief, I had argued that the uncharged shooting was not substantially similar to the charged conduct, particularly the carjacking, which was the offensive issue. In fact, here, the uncharged shooting was offered to prove identity. And Ruiz is not an identity case, it is an intent case. We need a higher degree of similarity when you're offering a prior offense to prove identity. And that was the situation here. And as I explained in the opening brief, the uncharged shooting was not substantially similar. What they had in common was they both, you know, both instances involved assault of conduct. The other critical point with regard to the uncharged shooting is that it was very inflammatory. It was not just evidence that maybe he, you know, it was not just, in other words, the government didn't just admit the evidence that he was circumstantially involved in an uncharged shooting. They presented a videotape of the victim in an underground parking lot in the van, bleeding from the neck and moaning and crying in pain. Assuming we agree with you that the uncharged shooting was, should not been admitted, would you discuss prejudice given the overwhelming nature of the other evidence? Well, I think there's two parts to that question. So, first of all, there's also the gang affiliation. Don't you, you have to separate the analysis. Well, I think that, well, let me go to this, yes. Yes, there was evidence against him in the form of text, the messaging, clearly. But I do think that, you know, there's a difference between violence and an uncharged shooting involving some young woman. There is. And in this case, he, the victims, the so-called victims, the men who testified against him, the drivers and the club, they all were impeached. They all got immigration benefits. They all had reason to shade their testimony. There was suggestions, and some of this came in and some of this didn't, but there was, certainly this was, you know, a gray area of the law, shall we say, that all of this was operating in. You had clubs in. Maybe they were serving after-hours liquor. So they definitely had a reason to curry favor with both local law enforcement and the investigating agency in this case. And, yes, there was, you know, certainly, I mean, I can't deny what's in the record, but when you have the shooting, that, again, I'll quote my former colleague, who I think has probably left the room, that made the jury, you know, the evidence of the shooting was overwhelming. And I will add, it was, you know, the government, the government really wanted to introduce it. You know, they chose not to charge that count, and then introduced the evidence. So they got to have their cake and eat it, too. But, counsel, they also introduced evidence, witnesses who testified that they were paying Mr. Cho because they were afraid of him, that he had threatened to beat them if they failed to pay, and that he participated in the charged carjacking. That's a lot of evidence. It was a lot of evidence. So how is this not harmless, then? Again, I think because there was, at least that evidence was controverted. The victims, again, they were impeached. They all got, they got immigration benefits. I want you to talk about that, actually. This is the second time you brought it up. So let's assume that even if they accepted that U visa certification from the government, how would that make a meaningful difference? Well, I think that the inflammatory nature of the shooting was the kind of evidence that appeals to passion. So by definition, that is the type of evidence that it casts, in other words, it's a game changer. Once you have evidence like that, it's kind of like, you know, these horrific images of child pornography, that the jury stops listening, and I think that's what happened here. I think you had this, and the other thing was, there was other, there were other, and let me just mention this. So, for example, there were issues with the identification of Mr. Cho in the carjack, the beating. So, you know, if you look at that, you know, Mr. Cho was heavily tattooed. Well, you couldn't, on his bare legs he has tattoos. You could not see them in the video. The identification of Mr. Cho by the victim of the beating, he said, I recognize his eyes. I mean, that's not the most compelling identification you've ever heard. He also said, and he also gave inconsistent statements. He told the police he was attacked by two black men. Then he changed it, and then he changed it again. So, when you look at that, and then you weigh the shooting against that, that's where you have an effect. Now, you know, I suppose, you know, if you look at it count by count, you might say, well, you know, these individual counts are separate, and, I mean, there were 57, so, you know, I did not do an individual analysis. I will say, even if it affects the carjacking count, though, there's prejudice there. I mean, that, at least, it has an effect on the carjacking count. I don't know. I think I've answered your question. And I think the other part of this is that the gang affiliation evidence adds to the prejudice here. The gang affiliation evidence was, if there was any relevance at all, it was so marginal because this was not a gang case. This was not a case where he was alleged to have been doing things with gang brothers. There was no, the defendant didn't call a fellow gang member as a character witness. We just, you know, essentially they put an expert up there to testify about Grape Street, said that the Grape Street gang engaged in extortion, as here, and that he'd arrested various people shown in the photographs, although not the defendant. But wasn't that put in there to demonstrate that the alleged victims were fearful of him? I mean, that, you know, this is a man who makes a threat, and we actually think he'll follow through with it. Except that, here's the key, the only witness, so there was, yeah, there was some rumored testimony, but basically the witness who testified about the pictures that he saw on Instagram, he didn't see them until after he started cooperating with law enforcement. There was no evidence that he knew about his gang status other than by rumor, and that he feared him because he had seen these Instagram photos, for example, and there was no evidence that Mr. Cho used his Instagram account to intimidate others. I mean, it looks like, frankly, your typical Instagram account with, hey, we're all buddies, and, you know, but we look very menacing. I mean, I think we've all seen those photos. Actually, if there's no more questions on this, I'd like to turn briefly to the vulnerable victim enhancement. And I'd like to save a couple minutes for a rebuttal. But this is, you know, the district court just got it wrong on this one. The victims in this case, the factors the district court cited have all either largely been disapproved as basis for vulnerability, like alienage and lack of English fluency. And, you know, I don't know. I mean, basically you have a lot of men who are driving young women around, and there was no showing that they were unusually susceptible to this conduct. They were not more unusually susceptible than the usual victim of extortion, and that's the test. You know, it's not, we don't look to see whether the defendant, because all criminals target victims with an idea toward success. The question is whether this group of victims was unusually susceptible in the framework of this kind of conduct. And they're not. This, you know, extortion frequently targets small businessmen. It targets people who pay cash. This is not an unusual, I'm not saying it's a pro-social activity, but it is not an unusual one. And these defendants, yes, they were part of the Korean community. It's also quite, you know, people tend to, criminals tend to go after people in their own community. But other than the fact that they were Korean, I mean, unless the district court wanted to say, well, I think Asian defendants are more vulnerable, which was almost what the judge said without saying so. On this point, you rely on United States v. Box from the Fifth Circuit, but the victims in that case were all white-collar professionals. How does Box support you in this case? Well, I think it's cited generally to show that the fact that in that case, those sheriff's deputies were targeting people that they knew were more likely to pay. And it was that they were more likely, and the Fifth Circuit said, well, the fact that they're more likely to pay doesn't really make a difference here. That doesn't help you. I think here, that's it. He targeted people that were more likely to pay. He knew that, you know, he – But more likely to pay because of their unusual vulnerabilities, right? I mean, their immigration status, language barriers, lack of knowledge of the American legal system, the cultural differences. But again, I don't think those are supported. And the reason is these were all long-term residents. These were not – and if you look at the other cases, like Bengali, which was cited by the government, these were not recent – these were not – I think the person who had been here the shortest time had been here for seven or eight years. And many people had been here for 20 years. So they lived in the community. They certainly knew the American law enforcement system. Did they still have language barriers even though they'd been here 20 years? They may have, but language barriers are not a – I mean, there's a Ninth Circuit case, and I'll probably cite the wrong name, but I believe it's Castellanos that you – and I'll look that up when I sit down. But, you know, a language barrier, just because somebody is a Spanish speaker, that doesn't mean that – that doesn't make them unusually vulnerable. And here, this is not – I mean, this is not like we have a small Korean community, for example, in the middle of the Midwest or, you know, some small town where they're really insular. This is a very large Korean community. There are a lot of connections. There are – you know, there are – there are LAPD that does outreach. LAPD makes it very clear they don't do immigration enforcement. It's on their – it's been on their website for many, many years. So in this context, these are not unusually vulnerable victims. If the panel has no more questions, I will reserve them. All right. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Jenna McCabe on behalf of the United States. I'll start with the shooting evidence as well. I want to first note that this evidence was not admitted solely for identification. It was also introduced as to the defendant's intent, which the Court had said was admissible because the defendant had engaged in a good deal of cross-examination, indicating that there may have been an innocent reason behind these payments. The central issue at trial was the defendant arguing that he had been providing a legitimate service and that these victims owed him money in exchange for that service. Additionally, because this is an extortion case, unlike other types of cases, general drug cases, or what have you, the reasonableness of the victim's fear under Montoya is another material point, and it was admissible for that as well. As one of the victims testified, the fact that he had heard that the defendant had shot a gun before contributed to his fear of the defendant and why he was paying him. And even on the identity, as the Andre case says, it's the unusual characteristics that show that something would be probative for identity. Taking the circumstances here, they tended to make these material points more likely. And it's not something where this is a generic act of violence, but rather the circumstances of who, what, when, where, why, and how. Can you point to me to specific evidence in the record that connects Mr. Cho to that uncharged shooting? Yes, Your Honor. So the quag witness that testified, testified about the defendant being the individual in that video, approaching the car and being the one who, there's a break in the video, but then is back where the shooting happens. So that's around 3 ER 599. We also have in 3 ER 671 and 672, the defendant's text messages banning certain driving companies from dropping off hostesses at that particular karaoke bar called On and Off Karaoke. And so those connect him there. It's the live witness testimony as well as the text messages. And so these circumstances about who these victim drivers, what the defendant's attack and retaliation on them, when being after hours upon dropping off hostesses, where in these karaoke parking lots, why, because the driver was not paying the defendant, and how the defendant bringing a weapon to approach a car having prepared for a situation just like this. I want you to talk about the how a little bit more because I don't agree necessarily that the how is close enough. One was a shooting. The other was a, so that one, a shooting at the car. The bullet struck the person in the neck versus beating a person with a bat. That to me is completely different. Understood, Your Honor. I think in the context of all of the circumstances, it is sufficiently similar to make it tending to prove the material point. It doesn't need to be identical. And here what we have is this threatening manner with a weapon. And the district court had specifically found that this was proportional to the charged carjacking. I think what the jury saw in those carjacking videos was the defendant trying to bash in the victim's skull with a metal baseball bat. The victim testified as much, and the doctor testified about the injury that he had to his arm, a nightstick injury, to prevent that bashing in of his skull. It was a very severe beating that the jury saw on video. And I think one of the points that was made in the reply brief was that the shooting showed a reckless endangerment to human life. I believe that the carjacking showed much more than that. It was an intentional endangerment of human life. And the district court's finding that it was proportional certainly was not clearly erroneous. And in the context of prejudice, which this court asked about, and harmlessness, all five of the charged victims testified about their fear of the defendant, about him personally threatening them. Two of them had been physically attacked by the defendant. One of them had seen the defendant attack others. Two victims had seen the defendant with guns at karaoke bars. They all testified consistently about their fear of him. And then when you talk about the legitimate service, we have at least three of the victims testifying that he was providing them no service at all. And it's corroborated by how this industry works, where they're being paid by the hostesses. They're not being paid by a defendant. They're not being called by a defendant to bring hostesses to particular bars. He's just banning them from going to bars if they don't comply with his extortionate demands, and then also attacking them. And unlike a legitimate service provider, the defendant showed repeatedly how he was fearful that law enforcement would detect this operation, whether it was the undercover extortion payment, where he is expressing repeatedly to the victim that he's concerned about undercover officers and changing the location for the meeting, whether it's in the text messages where he's talking about snitches, and he's talking about police, and he's asking other victims on camera whether or not they called the police. All of that evidence went to rebut his defense that he was providing a legitimate service, even beyond just the shooting and the gang evidence as well, which I'd like to go through the gang evidence because I think that there are three pieces to this. Both sides agree that the victim's testimony about the defendant being in Grape Street Crips was admissible. One of the victims testified that the defendant himself told him that he was in a gang. And so the posts that defendant made about his gang membership are admissible for the same reasons. The defendant was intentionally making this known. He was tattooing his body with Grape Street Crips terms, people, and different symbols. He posts repeatedly on Instagram about it, and the victim testified specifically that he had seen the defendant's posts every day. Now, the defendant didn't object to the Instagram posts coming in at trial, so there's not further development on that, but the jury certainly could have inferred that the victim had seen it. I mean, he testified that he had, and he went to screenshot them leaving the industry, indicating that he knew what was on the defendant's Instagram and wanted to preserve it to share with law enforcement. So then when the expert is called to testify, which is what the defendant objected to at trial, he provided context for the jury about things that wouldn't necessarily be familiar to them, terms like protection fee. That is something that would seem innocent or innocuous to a regular person who hasn't dealt with situations like this, but the expert was able to contextualize it. He was also able to testify about the makeup of the gang and that it was not just black members because the victims had testified that the defendant was in a black gang. Certainly, if the expert had not been able to testify about the makeup of the gang, the defendant would have challenged their credibility on that. And the expert also testified about the Instagram posts to show what these tattoos and what these different symbols and hand signs meant, and that was the only part that was addressed in closing argument. Just that the victims had said that this defendant was in this gang and they're afraid of him for that reason, and the defendant wanted them to be afraid of him for that reason. It helped keep them in line and keep them paying, and the expert tying that together for the jury is what was the purpose here. On that point, similar to the shooting, any error that this court might find with respect to the introduction of the gang evidence or plain error as to the Instagram posts, it would be harmless because of all of the evidence of the defendant using violence directly with his extortion scheme. When he is carjacking the victim on video, the victim is screaming, I will pay, repeatedly, and the defendant does not stop beating him. And also about the service that the defendant asserted he was providing these victims, as I mentioned, there were numerous pieces of evidence that the jury had to rebut that. And I want to address also the point that defense counsel made about the victims being impeached as to bias. There was only one victim that testified that he accepted a U visa, and he testified that he believed that he was not getting the U visa based on his testimony for trial. He just testified that he had accepted it. And to turn back a little bit to the harmlessness as to the shooting, defense counsel had mentioned that the shooting was the game changer, but here the carjacking video, with respect to the carjacking, was the game changer. It was very graphic of this defendant trying to bash in the victim's skull, and then his text messages, including telling a victim that he would see the real demon if he didn't pay him. He was so threatening to everyone that those were the game changers in this trial, and that was all charged conduct that we had. Counsel, can I ask you, before your time runs out, to talk about the two-level sentencing enhancement issue? Absolutely, Your Honor. So, defense counsel had mentioned that the factors that the court considered were disapproved of by this court. The only disapproval that I've seen of those factors are in Mann Act cases, which this court treats differently because of those types of crimes. They're actually approved of in this court's fraud cases, where the court has talked about, in the Castellanos case, the court specifically, while it said that it doesn't alone demonstrate vulnerability to have a particular ethnicity or speak a foreign language, but in combination with other factors, like a lack of education, extreme insularity, which we have here, superstition or lack of familiarity with United States business practices or law enforcement might suffice for fraud cases. Here, certainly, for this extortion case, these made these victims particularly susceptible to this defendant's chosen extortion scheme. It's not a situation like this court's Koziel case, where someone's trying to extort a celebrity. It's not a case like the Grape Street Crips might be extorting drug dealers in the Jordan Downs area. This was the defendant coming from Woodland Hills to Koreatown to find these Korean victims who were here, undocumented, using a Korean messaging application with them, being able to communicate with them when all of their levels of English were different, and some of them testified with interpreters, others of them didn't, but I think the court can see through the testimony that their English is broken. Counsel, what do you make of your friend on the other side's comment that, hey, some of these people have been here 7, 8 years, 20 years. Should we take that into account? Does it matter? I think this court is welcome to consider it, but it doesn't matter for purposes of this case because it was clear to the district court that their extreme insularity in this industry that they were in, their undocumented status, their lack of familiarity, the fact that they were here for that long, some of them still did not speak English well at all. They were all very afraid to go to law enforcement. I think it's clear from the record, two of them came forward after the carjacking. That was the final straw. One of them moved out of state, but police did not at that point even arrest the defendant. This continued to go on for years after that, and the other victims did not come forward to law enforcement. The defendant throughout was trying to keep them from coming forward to law enforcement, and even at trial itself, as was clear in the quag sidebar that we had, we would have loved to have charged the extortion related to the shooting, but that witness was unwilling to come forward because he was afraid. He then eventually, come trial, showed up to court to testify, but these victims were afraid, and the court did not clearly err in making those findings, particularly when given this court's authority on how the combination of factors can make a victim particularly susceptible, and here the defendant capitalized on that. He chose them for this reason. I think if you take a hypothetical of the Mexican mafia trying to come in and extort these victims, it would not have worked. This defendant, from his background, was able to communicate with them. He knew where they would be. He understood this after-hours karaoke industry that they were in, and he knew he could keep them all under control because he would be omnipresent, essentially, with large firearms and all of these beatings he was doing. And I see I am out of time, so unless the court has any other questions, I ask this court to affirm the convictions and the sentence in this case. Thank you. Ms. Landau? I think we disagree on a couple things in the record, so I'd just like to correct a couple of things. Just first to say the limited English speaking cases, U.S. v. Castaneda, that says non-fluency does not make victims vulnerable. I would add if these victims are vulnerable, then I would say the same. Then basically anyone, you know, you could say the same, that Mexican mafia members who extort drug proceeds from street dealers, that the street dealers are unusually vulnerable. I mean, they all fall in the same category. I mean, just, you know, the same argument can be made. This stretches that enhancement beyond its purpose. You know, this is not an unusually isolated community. We live in Los Angeles. There are all kinds of people, and there is all kinds of different crime. And these victims were not, do not fall into that category. On the gang evidence, the government contended that the pictures themselves should be reviewed for plain error. So I have a couple of points. First of all, when the defense moved to exclude gang evidence, they moved to exclude all gang evidence, and that's not in the excerpts of record, but it is in their motion to exclude docket 66. Second, I do not think the record is at all clear that any of the pictures, so first of all, the Instagram account was private, which means that, so Mr. Cho's account was private. That means that you have to get permission to follow it. So there's no, so whether they did or not, however he got those pictures, the evidence in the record showed that the victim in question saw them after he had been insulted and after they went to law enforcement. So there was really an insufficient foundation to show that the posts were used as a method of intimidation. And last, I would say that the evidence from the victims about Mr. Cho's gang membership was very, very minimal. One witness said, oh, I heard he was, he said he was a Korean gangster. And another witness said, well, I heard he was in a black gang. And then only, and one evidence did say that he had heard Mr. Cho was part of Grape Street. And at that point, actually, the defense renewed its motion to exclude the gang evidence, which was denied. With that, I see I'm out of time, and I will submit. All right. Thank you very much, counsel. U.S. v. Cho is submitted, and this session of the court is adjourned for today. So thank you very much. All rise. This court for this session stands adjourned.
judges: WARDLAW, ALBA, Brown